Filed 8/27/21 (unmodified opn. attached)
<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Amador)

----

| | |
|---|---|
| THE PEOPLE, | C083772 |
| Plaintiff and Respondent, | (Super. Ct. No. 14CR22366 ) |
| v. | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| GREGORY MICHAEL WILSON, | |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

APPEAL from a judgment of the Superior Court of Amador County, Susan C. Harlan, Judge. Affirmed as modified.

Hassan Gorguinpour and Deanna Lamb, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Michael P. Farrell, Senior Assistant Attorney General, Carlos A. Martinez Supervising Deputy Attorney General, Caely E. Fallini, Deputy Attorney General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Parts I, III, IV, V, VI, VII.

1

THE COURT:

It is ordered that the partially published opinion filed on August 11, 2021 be modified as follows:

1. On page 14, delete the second full paragraph that begins with, "Second, assuming arguendo that the common law definition . . . ."

2. On pages 14–15, delete the paragraph that begins with "At oral argument, counsel for defendant argued…."

3. On page 15, in the first full paragraph that begins with "Third", replace it with the word, "Second."

4. On page 15, in the second full paragraph that begins "With no evidence…," replace that first sentence with:

> With no substantial evidence that defendant reasonably believed deadly force was necessary to defend against a robbery or burglary involving the theft of the keys, there was no cause to give such an instruction.

This modification does not change the judgment. Appellant's petition for rehearing is denied.

FOR THE COURT:


_____/s/_____
ROBIE, Acting P. J.


_____/s/_____
MURRAY, J.


_____/s/_____
HOCH, J.

2

Filed 8/11/21 (unmodified version)
<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Amador)

----

| | |
|---|---|
| THE PEOPLE, | C083772 |
| Plaintiff and Respondent, | (Super. Ct. No. 14CR22366 ) |
| v. | |
| GREGORY MICHAEL WILSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Amador County, Susan C. Harlan, Judge.  Affirmed as modified.

Hassan Gorguinpour and Deanna Lamb, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Michael P. Farrell, Senior Assistant Attorney General, Carlos A. Martinez Supervising Deputy Attorney General, Caely E. Fallini, Deputy Attorney General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Parts I, III, IV, V, VI, VII.

A jury found defendant Gregory Michael Wilson guilty of second degree murder. He was sentenced to 17 years to life. On appeal he contends the trial court erred in failing to (1) instruct the jury sua sponte on defenses arising from the use of deadly force to protect against common law felonies; (2) instruct sua sponte on the Home Protection Bill of Rights presumption; and (3) provide the jury with verdict forms for voluntary manslaughter. He also contends (4) the errors cumulatively require reversal; (5) his prior prison term enhancement must be struck in light of Senate Bill No. 136; and (6) the imposition of certain fines and fees were unlawful in light of *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

We will strike the prior prison term enhancement and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The victim was stabbed to death after an argument erupted at a home gathering. At the house that night were three couples: the husband and wife, who lived in the house; defendant and defendant's girlfriend, who were staying at the house; and the victim and his girlfriend. Also there was a teenager, who had come to smoke marijuana, and four young children.

At trial, the adults and the teenager testified. The victim's girlfriend, defendant's girlfriend, and the teenager testified for the prosecution. The married couple and defendant testified for the defense.

With few exceptions, the witnesses' testimony largely agreed as to the events surrounding the stabbing. But they parted ways regarding the actual stabbing.

### The Party and the Subsequent Events

According to witnesses, the victim and his girlfriend came to the married couple's house the day before the murder. Also at the house were defendant and defendant's girlfriend, who the married couple let stay at their home. A teenager, who was friends with the husband's son, was there too (though the son was not). Rounding out the group

2

were the two young children of the married couple and two others who were the victim's girlfriend's.

At the house, the adults drank, smoked marijuana, and hung out. As it grew dark, the young children were put to bed. Next, defendant and his girlfriend went to bed, followed by the teenager.

Thereafter, the married couple, and the victim and his girlfriend retreated to the master bedroom. Methamphetamine was consumed and at some point, a fight broke out.[1] Eventually the married couple told the victim and girlfriend to leave. The quartet then moved to the living room, still fighting.

At some point, defendant woke up and confronted the victim outside at a gate between the stairs to the porch and the porch. There defendant stabbed the victim five times: once in the chest, once in the arm, and thrice in the back. Four of the wounds, the one to the chest and three to the back, were each fatal.

After the stabbing, defendant, his girlfriend, the married couple, their kids, and the teenager got in a van and left. Before leaving, the husband moved the victim out of the van's way. They drove to the husband's mother's house. There, the married couple, defendant, and his girlfriend concocted a story to tell police, assigning blame to a fictional "Mike Wright."

Later, the husband, the wife, and defendant's girlfriend each pled guilty to felony accessory after the fact.

At defendant's trial, the jury heard five separate accounts of the murder. But only the wife and defendant claimed to remember the actual stabbing.

---

[1] The fight's origin is disputed: the victim's girlfriend testified it started when she fell off the bed and her hand accidently caught the wife's face. The husband testified it started when the victim's girlfriend punched the victim and then the wife. The wife testified it started when group sex was proposed, the victim signaled his willingness, and his girlfriend punched him in the face followed by the wife.

3

## The Prosecution Witnesses Accounts

### The Victim's Girlfriend

The victim's girlfriend — who drank at least eight shots with beer, smoked marijuana, and was on medication — testified that after leaving the master bedroom, the fight continued in the living room.  The wife threatened her, while she and the victim tried to deescalate.  Defendant and the husband joined the fray[2], with everyone telling the victim to leave and the girlfriend to stay because she was too intoxicated to drive.

The victim's girlfriend took her kids down to her car, but it was locked, so she waited by the car with her kids.  When the victim arrived, she told him she didn't have her keys.  The victim returned to the house and was told the keys weren't inside.  When the victim relayed the response, the girlfriend told him to go back.  He did but never came back.

It was too dark to see, and the girlfriend heard no yelling or commotion.  Instead, she saw the married couple, defendant, and his girlfriend run down the stairs and pile into the van in the driveway.  She then saw the van headlights illuminate the victim's body.

### The Teenager

The teenager testified that when he went to bed, the noise kept him from sleeping. He heard the commotion in the master bedroom, along with the victim and girlfriend being told to leave, and the victim asking for his car keys.  He then heard the group on the porch.  This was followed by the sound of defendant being told that the victim and girlfriend were messing up the porch and not wanting to leave.  He then heard defendant and defendant's girlfriend on the porch, along with the wife's yelling.

---

[2] The victim's girlfriend testified defendant and defendant's girlfriend never went to bed but remained in the living room.

4

For several minutes, defendant repeatedly told the victim to leave.  Defendant then said:  "You have five seconds to get off the porch or I'm going to stab you."[3]  The order was followed by a "ruffling, commotion," and then he heard someone (he thought it was defendant) say, "I stabbed him."  Someone else screamed, "You stabbed him?"

The teenager subsequently got in the van and left with the others.

**Defendant's Girlfriend**

Defendant's girlfriend of 11 years testified that she and defendant went to bed after a day where "everybody drank and did drugs, smoked weed."  She woke to the sound of fighting and screaming.  The victim was "hollering obscenities and asking for his keys."  She also heard the front door being kicked multiple times.

She went to the living room and saw the wife screaming that the victim's girlfriend had punched her.  The husband was also there, trying to get the victim, who was then outside, to leave.

The married couple went out on the porch, to confront the victim who was trying to come back up the stairs to the porch:  "[the wife] was climbing over the top of [the husband] to hit [the victim] and pull his hair and screaming obscenities, and [the husband] was standing between them, just trying to get them to stop."

At some point, the husband asked defendant's girlfriend to get defendant.  She went to the bedroom, woke him, and told him the victim wasn't leaving the house and the married couple were fighting with him.  Defendant said he would, "F-ing kill him."  Defendant's girlfriend, however, did not take the comment seriously; defendant just seemed mad at being woken up.  Also, she and defendant had always gotten along with the victim, and she didn't think defendant had smoked or drank enough to be impaired.

---

[3]  The teenager was later recalled by the defense during its case and he testified he never said this.  He claimed what he heard defendant say was "You have five seconds to leave or something else is going to happen."

Defendant dressed and went out on the porch.  The victim was still trying to come up the porch stairs, and the married couple were still on the porch.  Defendant's girlfriend went into the room with the teenager and waited.  Less than 10 minutes later, she heard the wife come into the house screaming, "We got to go, we got to go, we got to go."  They all got in the van and left.

Defendant's girlfriend testified she never heard the victim make a threat, she only heard him repeatedly ask for his keys.

**The Defense Witnesses Accounts**

**The Husband**

The husband explained that he had known defendant for 10 to 15 years.  As to his memory of the night, he admitted:  "My timeline, it was horrible . . . it's been years and I was drinking heavily."

After defendant and his girlfriend went to bed, the husband and his wife, along with the victim and the victim's girlfriend drank and used methamphetamine.  An altercation led to the victim and girlfriend being asked to leave.

The group migrated to the living room, and the victim and girlfriend ended up outside.  When the security door locked behind them, the victim screamed, yelled, banged a window, and "started kicking on the doors . . . trying to break into the house."

The husband testified the victim's demeanor was violent, explaining, "I was concerned for everyone's safety."  He added, "I didn't know what would happen if he made it into the house . . . .  He was extremely belligerent and drunk and, you know, making threats."  He also said:  "I guess the big hangup with them leaving was their keys were missing, and to try and keep everyone separated I wasn't able to look for these keys and I didn't feel safe letting him inside to look for the keys."

Asked about waking defendant, the husband answered:  "I don't remember who woke him up or asking anyone anything.  I mean, honestly, I was just really drunk.  I was, you know, falling-down, blackout drunk almost."

6

At some point the victim came to the front door and was trying to get inside. The husband worried he would assault someone. With defendant in earshot, the victim said his brother kills people and is in prison for killing someone. He also said he had a gun in the truck, claimed to be unafraid of killing, and issued several threats to, "kick your ass," "stab you guys," and "kill you."

At one point defendant went outside, and the husband could not clearly see what happened. "He was on the porch. That's all I know."[4] The victim was either on the porch or on the steps. Defendant tried to calm the victim, who continued yelling, screaming, and making threats. The husband vaguely recalled the victim turning and leaving: "that's what I remembered. And so it's foggy what happened right before he left, but yeah, I just saw him leave. He just walked down the steps and walked away." Sometime after, defendant returned to the house, and the husband "possibly" heard defendant say, "I stabbed him."

On cross-examination, the husband was asked about telling an investigating officer that defendant pushed past him at the security door and went out to the victim on the porch, the husband said, "I don't remember specifically." Asked about saying there was almost instantly a fight, he said, "I do remember something about a fight." Asked about defendant "bro-hugg[ing]" the victim, the husband said, "Maybe. I think."[5] The husband denied any memory of telling the officer the victim never made any threats to the husband or his family, nor did he threaten to arm himself.

---

[4] The husband testified that he did not know if he and his wife were on the porch when defendant went outside with the victim.

[5] On redirect, he testified, "I really don't remember," when asked if he had seen the "bro-hug" or simply heard about it.

**The Wife**

The wife testified that after the blowup in the bedroom, they went to the living room. She and her husband continued to tell the victim and girlfriend to leave, while the victim's girlfriend was attacking everybody and screaming.

The victim and girlfriend gathered their things and made a couple of trips to their car. The wife testified, "it was brought to our attention that keys were missing . . . ." At some point, the victim and girlfriend left the house and the door was shut and locked behind them: "it didn't feel safe having them in the home." She told them to wait while they looked for the keys. After 20 minutes of looking, she woke defendant and his girlfriend.

She told defendant's girlfriend "everything's out of control," and she needed help finding the keys. She also asked defendant to help her husband diffuse the situation. She could hear banging and kicking on the window and door. "It felt like they were trying to break into my house."[6]

Defendant went with the husband to the door. At some point, defendant's girlfriend and the wife told the victim and his girlfriend that their keys couldn't be found, and they wouldn't be let back in. The victim and girlfriend "freaked out," and were "actively, like, trying to break my window and trying to break . . . my screen door" to get in. The victim said he had a brother who was in prison for murder, adding he was "not afraid to fucking kill you."

Defendant and the married couple ended up on the porch. The wife did not remember who opened the door. The victim was standing on the stairs on one side of the gate separating the porch from the porch stairs; the married couple, defendant and his

---

[6] Called on rebuttal, an officer testified to seeing no boot mark or indentation on the security gate; the gate was merely "worn" and "weathered."

girlfriend were on the other side, standing on the porch. The wife denied trying to crawl over her husband to get at the victim.

The victim kept refusing to leave without the keys, threating, "you're going to have to fight me if you want me to leave," "I'll fuck you up," and, "I'm not afraid to fucking kill you."

The wife testified, "I was scared. I mean, he was freaked out," She added, "He wanted in to get his keys. And . . . he had stated several times that he was going to get them, and so I was worried that yeah, he could hurt somebody. I didn't feel like he was going to hurt me."

After 10 minutes or so, while the victim was on the top steps of the stairs, leaning over the "railing," the victim lunged at defendant. Defendant and the victim then got "in some sort of, like, scuffle, like a little kind of fight, like a punchy kind of thing, kind of like not super intense," and defendant put his arm around the victim as though he was giving a hug. The victim then walked away.

The wife asked defendant what he had said to the victim. Defendant held up a knife and said, "I fucking stabbed him."

On cross-examination, the wife was asked if she told an officer that defendant had said to her: "I fucking told him, I fucking told him you don't come here and fuck with us like that," she responded: "I don't recall saying that, but again, if it's in my statement, then I'm sure that I said that." She conceded telling an officer, her husband was very strong, and the victim could not have gotten through the gate with him holding it shut. She also agreed she was not in fear of her life, and the victim never brought the safety of her kids into the situation.

**Defendant's Testimony**

Defendant testified that before going to bed, around 10:00 p.m., he was smoking concentrated cannabis and taking a "few shots." "Everybody was drinking excessively."

9

The wife woke him, saying the victim wouldn't leave. Defendant went to the victim in the front room and told him to go. He hugged the victim and led him outside. Defendant had known the victim for around 18 months and had never had any arguments with him. But after shutting the door, the victim "got really, really just amped up and he got violent."

The victim started kicking the door, saying, "I need my F-ing keys." He grew more aggressive, demanding to get in. The wife yelled back at the victim through the window. The married couple and defendant joined the victim on the porch. The victim was shouting, "Fuck you motherfuckers," as he was told to leave.

The victim stood on the top of the stairs by the gate, and wanted in. He continued to make threats, saying that either he or his brother was in prison for murder. The victim said he wasn't afraid to kill, and defendant believed it.

The married couple were at the gate, and the wife continued to yell at the victim. For 10 to 15 minutes defendant tried to reason with the victim. According to defendant, the victim said, " 'I'm going to kill you motherfuckers and [the wife] and the kids.' " Defendant thought the victim was "going to try to hurt somebody." However, he did not see any weapons in the victim's possession. And the wife had a flashlight, while the husband had a bat.

Defendant testified the victim lunged toward him, and he responded by grabbing his knife from his pocket and stabbing the victim.[7] He described grabbing the knife as "a reaction," adding it "just happened so damn fast." The victim then veered to the left, and defendant stabbed him. He added, "and then he's going around and I stab, and then I stab, stab, stab. It just happened so fast. It was in a second." Defendant testified that when the victim veered past him, he thought the victim was going toward the married

_____

[7] Defendant testified that he normally carries a knife in his left pocket and he "use[s] it as a tool when [he] work[s] on cars."

10

couple. The first stab was to the neck or chest area, the next was to the arm, and then he stabbed the victim in the back because he kept going past defendant. Defendant admitted to stabbing the victim five times.[8] He explained, "I just reacted. I was scared. I thought he was going to come after me and after them. He was threatening to kill People. I didn't know. I believed him." After the last stab to the back, the victim turned around and left. Defendant denied there was a scuffle or "punchy fight" between him and the victim. And he admitted that when he was interviewed by law enforcement after his arrest, he told them he did not remember how the stabbing happened. He told them, "I don't know what the F happened, I really don't. I don't know exactly how it went down."[9]

## Verdict and Sentencing

The jury found defendant guilty of second degree murder (Pen. Code, § 187, subd. (a))[10], and found he had used a deadly weapon (§ 12022, subd (b)(1)). The trial court found defendant had sustained a prior prison term for felon in possession of a firearm (§ 667.5, subd. (b)).

The trial court imposed a sentence of 15 years to life for second degree murder along with two consecutive one-year terms for the deadly weapon enhancement and the prior prison term.

---

[8] Law enforcement found blood drops on the stair hand railing, the steps and the walkway leading away from the steps. A single drop of blood was found on the porch. The paths of the stab wound to the chest and two stab wounds to the back were downward.

[9] A psychologist testified that defendant suffered from Post-Traumatic Stress Disorder. (PTSD) He testified that when a person with PTSD goes through a traumatic event, "they can't remember a lot of things" if interviewed "right after an event" but over time the person might "start to randomly remember" and fill in the "gaps."

[10] Undesignated statutory references are to the Penal Code.

## DISCUSSION

### I. Instructions on Defense Against Commission of Common Law Felonies

Defendant raises three contentions, each challenging the trial court's failure to instruct the jury, sua sponte, on defenses arising from defendant's fear that the victim would enter the house to take the car keys. He specifically challenges the court's failure to include optional bracketed portions of CALCRIM Nos. 505 and 506, as well as the failure to include similar language in CALCRIM No. 571. We find no error.

### A. Pertinent Instructions Given

Before closing arguments, the trial court instructed the jury with CALCRIM No. 505, "Justifiable Homicide: Self-Defense or Defense of Another." The jury was told, in pertinent part, that a defendant is not guilty of murder where he "reasonably believed that he or someone was in imminent danger of being killed or suffering great bodily injury;" and "the defendant reasonably believed that the imminent use of deadly force was necessary to defend against that danger. "

The jury was also instructed with CALCRIM No. 506, "Justifiable Homicide: Defending Against Harm to Person Within Home or on Property." It was told a defendant is not guilty of murder if he "reasonably believed that he was defending a home against [the victim] who violently or riotously or tumultuously tried to enter the home intending to commit an act of violence against someone inside; . . . the defendant reasonably believed that the danger was imminent; . . . [and] reasonably believed that the use of deadly force was necessary to defend against the danger . . . ."

The jury was also instructed with CALCRIM No. 571, "Voluntary Manslaughter: Imperfect Self-Defense or Imperfect Defense of Another." It was told, "[a] killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense or imperfect defense of another." This requires that "the defendant actually believed that he or someone else was in imminent danger of being killed or suffering great bodily injury, and . . . believed that the

12

immediate use of deadly force was necessary to defend against the danger, but . . . at least one of those beliefs was unreasonable."

## B.  Defendant's Contentions

Defendant maintains that the jury should have been told that deadly force is also justified when defending against certain common law felonies, including robbery or burglary.  Defendant points to the optional bracketed language in CALCRIM Nos. 505 alluding to the use of force to defend against "imminent danger of being . . . robbed . . . [or the victim of an] *other forcible and atrocious crime*," and to similar language in CALCRIM No. 506 regarding the defense against an intruder bent on committing a "*forcible and atrocious crime* . . . ."  He argues that the bracketed language should have been included and similar language should have been appended to the CALCRIM No. 571 instruction on imperfect self-defense.

Defendant reasons that in his case, the victim's conduct constituted robbery and burglary a (" 'forcible and atrocious crime' ") under a common law definition of robbery.  In support he cites a treatise from 1894 and argues the property subject to the robbery need not belong to the victim, it need only be in the victim's possession.  Therefore, the trial court should have instructed on defense against a felony arising from defendant's fear that the victim was attempting to enter the home at night to take property by force, namely the keys.  The contention is meritless.

## C.  Analysis

A trial court must instruct the jury, sua sponte, on defenses relied on by the defense or that are supported by substantial evidence and not inconsistent with the defense's theory of the case.  (*People v. Rangel* (2016) 62 Cal.4th 1192, 1224.) "Substantial evidence supporting sua sponte instruction on a particular defense is evidence that is 'sufficient to "deserve consideration by the jury, i.e., 'evidence from which a jury composed of reasonable [persons] could have concluded' " ' that the particular facts underlying the instruction did exist."  (*People v. Brooks* (2017) 3 Cal.5th

13

1, 75.)  Here, substantial evidence did not support an instruction on the need to defend against a robbery or burglary.

First, defendant asserts the victim "wanted to enter the home and take those keys against the wishes of everyone who lived there."  This is only partially correct.  The evidence establishes that they did not want the victim to enter the home, but it does not establish that they wanted to keep the keys — the evidence establishes they would have given the victim the keys if they had found them.

Second, assuming arguendo that the common law definition of robbery and burglary (as opposed to the current statutory definition of those crimes) is the appropriate definition for consideration on whether to give the instruction, there is not substantial evidence that the keys could have been the target property underlying such crimes even at common law.  The occupants of the home did not own the keys that were the subject of the supposed robbery and burglary.  Defendant asserts the keys need not have belonged to them, but only need have been in their possession.  In support, he relies on *People v. Edwards* (1925) 72 Cal.App. 102.  But he apparently would have us ignore what the *Edwards* court said in this regard:  "The third essential element in the crime of larceny is that *the thing taken and carried away should be the property of another*.  [Citation.]  That is, someone other than the taker *must have in the thing taken a general or special property right* which is invaded by the trespass committed in the taking.  Considered as an element of larceny, 'ownership' and 'possession' may be regarded as synonymous terms; for *one who has the right of possession* as against the thief is, so far as the latter is concerned, the owner."  (*Id*. at p. 116, italics added.)  Here, there is simply no evidence that the home occupants had *a right of possession* as to the keys.

At oral argument, counsel for defendant argued that the mere act of possessing the keys conferred a legal right upon the residents to possess the keys against the intrusion for the reason that the victim and his girlfriend left the keys in the house voluntarily.  Counsel provided no authority for that proposition and we are aware of none.  As we see

14

it, no evidence established that the occupants had a right to possess the keys and thus they could not be the victim of a larceny.

Third, while witnesses testified that the victim had demanded the keys, made threats, and kicked the door; and the witnesses feared the victim would get in — no witness testified that defendant's use of deadly force was in defense of an attempted robbery or burglary or any form of theft. Only two witnesses, the wife and defendant, testified to actually seeing the stabbing, or having any memory of it. And both testified that defendant used deadly force because the victim lunged at defendant and the married couple. Asked what he was thinking when he stabbed the victim, defendant testified: "I wasn't. I just reacted. I was scared. I thought he was going to come after me and after them. He was threatening to kill people I didn't know. I believed him." He also testified that the last thing the victim said before lunging was, "I'm going to kill you motherfuckers and [the wife] and the kids." Defendant did not testify he was trying to stop the victim from taking property, let alone the keys belonging to the victim's girlfriend. Indeed, as noted, the evidence established that the residents would have voluntarily given the keys to the victim if they could have found them.

With no evidence the house occupants had a possessory interest over the keys or that defendant reasonably believed deadly force was necessary to defend against a robbery or burglary involving the theft of those keys, there was no cause to give such an instruction. Defendant asserted he killed in self-defense or defense of others — a theory the jury rejected. This claim of instructional error is meritless.

## II. Home Protection Bill of Rights

### A. Section 198.5

Defendant contends the trial court erred in failing to instruct the jury on the Home Protection Bill of Rights, under section 198.5. Section 198.5 provides: "Any person *using force* intended or likely to cause death or great bodily injury *within his or her residence* shall be presumed to have held a reasonable fear of imminent peril of death or

15

great bodily injury to self, family, or a member of the household when that force is used against another person, not member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred." (§ 198.5.) (Italics added) Defendant argues a section 198.5 instruction creates a presumption in his favor and failing to give it was error.

As the italicized language makes clear, the presumption applies only when the resident uses force *within the residence*. That is not what happened here. Accordingly, we conclude defendant's claim is meritless.

## B. Additional Background

As pertinent to this contention, the house was elevated 10 to 15 feet above the road. The porch was elevated and had stairs leading up to it from a walkway that connected to the driveway. There was a wooden gate at the top of the stairs. The gate was secured by a latch and did not have a lock. The front door to the residence had a black metal security screen door with a locking lower handle and dead bolt lock. Law enforcement found no damage to the porch gate or the front door security screen door.

## C. Analysis

The section 198.5 presumption requires that a resident's use of force must be *within the residence,* and thus an unlawful and forcible *entry* into a *residence* is a predicate to application of the presumption. (*People v. Brown* (1992) 6 Cal.App.4th 1489, 1494-1495 (*Brown*); see also 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2020) Defenses, § 76 ["Entry into the residence is required before the presumption applies"].)[11]

---

[11] There are actually four elements to the section 198.5 presumption: (1) an unlawful and forcible entry into a residence; (2) by someone who is not a member of the family or the household; (3) the residential occupant used "deadly" force (as defined in § 198.5) against the victim *within the residence*; and (4) the residential occupant knew of the unlawful and forcible entry. (*Brown, supra,* 6 Cal.App.4th at pp. 1494-1495.) We

16

Here the victim had not forced entry into the residence; he was on the steps to the porch when he was stabbed.

This court held that a porch is not a residence for purposes of section 198.5 in *Brown, supra,* 6 Cal.App.4th at p. 1491. There, the defendant resident, while standing in his front doorway, shot the victim, who was standing on the defendant's porch at the time. (*Ibid.*) The *Brown* court held: "Although there was evidence that the victim's entry onto defendant's front porch was unlawful and forcible, an entry onto a front porch like defendant's *does not constitute entry into a residence* as required under section 198.5." (*Ibid.*, italics added.) The porch in *Brown* was "an unenclosed front porch, without any signs, gates or other indications that would tend to show the residential occupant did not expect intrusion into that area." (*Ibid.*) In holding the porch was not the "residence" for purpose of section 198.5, the *Brown* court explained: "A reasonable person would not expect protection from unauthorized intrusion onto this kind of porch. Quite the contrary. Social convention dictates that anyone wishing to summon the occupant's presence or gain entry into the home must first enter the porch." (*Id*. at p. 1497.)

Similarly, here, nothing about the residence indicates the married couple expected protection from unauthorized intrusion onto the porch. The porch gate had no lock. And as is apparent from photos of the porch and gated stairs in the record, anyone wishing to summon the occupants inside the home would have to first enter the porch through the gate.

Defendant attempts to distinguish *Brown*, pointing to its language that: "Absent 'no soliciting' signs or a gate or some other barrier, Girl Scouts selling cookies, the person delivering the newspaper, the door-to-door salesperson or any stranger will likely come onto a front porch of this nature, without permission. The reasonable residential

---

address the third element here, whether the resident used force against the victim *within* the residence.

occupant would not react violently to this entry." (*Brown, supra,* 6 Cal.App.4th at pp. 1497–1498.) He argues that here, by contrast, the porch was elevated with a latching gate, and to reach the porch one had to walk from the sidewalk, up the L-shaped driveway, and up a set of stairs. He maintains that with the porch stair gate latched, "a resident could rightly expect to be free from intrusion onto the porch." We disagree.

While the *Brown* court noted the absence of a gate, its absence was not dispositive. Rather the holding turned on the absence of anything in the "*nature of structure's composition . . .* such that a reasonable person would expect some protection from unauthorized intrusions." (*Brown, supra*, 6 Cal.App.4th at p. 1496.) While here the porch had a gate, nothing indicates it was there to protect from unauthorized intrusions. Indeed, the wife told an officer the gate was put in to keep the kids from falling off the stairs. Nobody testified it was installed for security or keeping people off the porch. The gate was no taller than the porch railings, it had no visible lock, and nothing on it would indicate to someone delivering a package or selling cookies that entering the porch to knock on the door was not permitted. And while there was a metal security gate on the house, it was attached to the front door, not the stairs leading to the porch.

Defendant also argues that we should consider how the gate was used prior to the stabbing. He notes that at the time of the stabbing, the residents were using it to keep the victim out, and any permission previously given to the victim had been effectively rescinded. Thus, according to defendant, the gate marked the boundary of their residence "in their minds and in fact." Defendant also argues that a general consent to enter spaces can be restricted to certain purposes or certain times. At oral argument, counsel for defendant argued that in addition to the gate, there was a trio of people trying to keep the victim from entering onto the porch and based on that testimony an instruction on the section 198.5 presumption should have been given.

Defendant cites no authority supporting an expansion or contraction of what would be considered *within* the residence based on the residents' conduct at the time

18

force was used against an intruder. And in our view, this elastic approach to defining what is within a residence is untenable. It would allow the presumption to be applied wherever a resident takes a stand against an intruder, effectively rendering the requirement that the force be used within the residence a nullity.

As we have noted, the *Brown* holding turned on the absence of anything in the "*nature of a structure's composition* . . . such that a reasonable person would expect some protection from unauthorized intrusions." (*Brown, supra*, 6 Cal.App.4th at p. 1496.) In reaching that conclusion, the *Brown* court looked to the decisional law on burglary to determine what constitutes an entry into a residence. (*Id.* at pp.1495-1496.) All of those cases focused on the physical part of the structure where the entry was made and none considered conduct by the residents. (*Ibid.*) Consistent with that analysis, we look to the physical character of the residence to determine whether an area is *within the residence* for purposes of section 198.5. The activities of the residents outside a residence does not expand the area defined by the "structure's composition" beyond that which would otherwise be considered *within* the residence.

Accordingly, we conclude that the porch here was not a residence for purposes of section 198.5. The trial court, therefore, had no duty to instruct on the Home Protection Bill of Rights.

### III. Defendant's Claims of Ineffective Assistance of Counsel

Defendant also claims his trial counsel rendered ineffective assistance in failing to request the above discussed instructions. Having concluded those instructions were unsupported by the evidence, we reject the claim of ineffective assistance. (See *People v. Thompson* (2010) 49 Cal.4th 79, 122 ["Counsel is not ineffective for failing to make frivolous or futile motions"].)

### IV. Verdict Forms

Defendant next contends the trial court erred in failing to provide verdict forms for voluntary manslaughter, after the jury was told it would receive verdict forms. He claims

prejudice because the jury was not instructed with CALCRIM No. 640, and the jury returned verdicts on the least culpable charge for which they were provided verdict forms. Again, we conclude defendant's claim is meritless.

## A. Additional Background

The jury was instructed on first and second degree murder and voluntary manslaughter. At the outset of those instructions, the jury was instructed to "decide whether the killing in this case was unlawful, and if so, what specific crime was committed." The jury was also instructed on two theories of voluntary manslaughter, sudden quarrel-heat of passion and imperfect self-defense.

During closing argument, the prosecutor told the jury: "If you find first degree, . . . then there is no need to evaluate that second degree or the voluntary manslaughter. However, if you find not guilty on the first degree, then you go on to evaluate whether there's second degree and then so forth." She also explained: "even if you find the second degree, malice aforethought, and the additional willful, premeditated, and deliberate, you still have to evaluate whether there's some type of reduction that takes it to a voluntary manslaughter."

Defense counsel provided argument concerning voluntary manslaughter. Counsel first discussed imperfect self-defense, segueing into that theory of voluntary manslaughter from an argument about complete self-defense. Counsel argued: "It's not first-degree; it's not second-degree. It's either innocent or possibly manslaughter." Counsel then argued sudden quarrel-heat of passion voluntary manslaughter, stating: "So this certainly applies to that confrontation there at the top of the steps and the surrounding circumstances as [defendant] perceived them at that moment, in that place. [¶] So this — this would reduce the offense to manslaughter. So please take a look at . . . the heat-of-passion instruction."

As part of the court's concluding instructions, before deliberations, the trial court told the jury: "If you need to communicate with me while you're deliberating, send a

20

note through the bailiff . . . ." "Do not take anything I said or did during the trial as an indication of what . . . your verdict should be." And "You will be given verdict forms."

## B. Analysis

Our high court has explained, "any failure to provide a [verdict] form, if error it is, results in no prejudice when the jury has been properly instructed on the legal issue the trial presented." (*People v. Osband* (1996) 13 Cal.4th 622, 689–690 (*Osband*).) "When 'the jury has been properly instructed as to the different degrees of the offense, it must be presumed that if [the jurors'] conclusion called for a form of verdict with which they were not furnished, they would either ask for it or write one for themselves. It certainly could have no necessary tendency to preclude them from finding such verdict.' " (*Id*. at p. 690.)

Here, following *Osband*, we conclude any error in failing to provide a manslaughter verdict form was harmless. Had the jury wished to find defendant guilty of that charge, it would have either informed the court of the missing verdict form or written its own.

Undeterred by the precedent of our state's high court, defendant argues that because the jury was not instructed with CALCRIM No. 640 and because the jury returned a verdict on the least culpable charge for which they were provided a form, the error was not harmless. CALCRIM No. 640 essentially instructs the jury on the order it may consider homicide counts, and that it may not return a guilty verdict on a lesser included offense unless it has found the defendant not guilty of the greater offense. Defendant argues that CALCRIM No. 640 "would have clued the jury into the fact that they were missing a form to match a finding of voluntary manslaughter." He adds that the bench notes to CALCRIM No. 640 requires the trial court to instruct, sua sponte, with CALCRIM No. 640 or 641 in all cases charging first degree murder along with lesser included offenses.

21

Defendant's position is untenable. We assume jurors are intelligent, particularly when it comes to understanding jury instructions. (See *People v. Sattiewhite* (2014) 59 Cal.4th 446, 475 [" ' " 'we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given' " ' "].) It is inconceivable that a jury — having been instructed on voluntary manslaughter and hearing closing arguments on it — would either forget about voluntary manslaughter or conclude it was no longer an available option because the verdict forms were missing. It is even more improbable that had such a misunderstanding occurred, CALCRIM No. 640 would have cured it.

Finding no prejudice in the missing verdict forms for voluntary manslaughter, the contention fails.[12]

## V. Cumulative Error

Defendant also contends the above claimed errors were cumulatively prejudicial. Having rejected those claims of error, we reject this contention as well. (See *People v. Bolin* (1998) 18 Cal.4th 297, 335.)

## VI. Senate Bill No. 136

In supplemental briefing, defendant asks that we strike his one-year prior prison term enhancement in light of Senate Bill No. 136 (2019-2020 Reg. Sess.) (Stats. 2019, ch. 590, § 1). Effective January 1, 2020, Senate Bill No. 136 eliminates the section 667.5 one-year prior prison term enhancement for all prior convictions, except sexually violent

---

[12] Defendant also contends his trial counsel rendered ineffective assistance in failing to ensure the jury was provided with verdict forms for voluntary manslaughter. We reject this contention for two reasons. First, as discussed, no prejudice resulted from the missing verdict forms. Second, defendant offers no reasoned grounds for holding defense counsel responsible for missing verdict forms, particularly where nothing indicates counsel was or should be part of the forms' chain of custody.

offenses.  (§ 667.5, subd. (b).)  The People agree defendant is entitled to its ameliorative benefit. 136.

We agree with the parties that because defendant's sentence is not yet final, and because his prior offense was not a sexually violent offense, he is entitled to the ameliorative benefit of the amendment.  (*People v. Gastelum* (2020) 45 Cal.App.5th 757, 761, 772; *People v. Winn* (2020) 44 Cal.App.5th 859, 872-873; *People v. Lopez* (2019) 42 Cal.App.5th 337, 341.)

We will therefore strike the one-year prior prison term.

## VII.  Fines and Fees

In supplemental briefing, defendant contends the imposed $30 conviction assessment (Gov. Code § 70373) and the $40 court security fee (§ 1465.8) violated his right to due process and equal proception.  He also contends the statutory minimum $300 restitution fine (§ 1202.4) violated his right to due process and freedom from excessive fines.  In support, he cites *Dueñas*, *supra,* 30 Cal.App.5th 1157, which held due process requires the trial court to stay execution of restitution fines, as well as court operation and conviction assessments, until it has held a hearing and determined the defendant has the present ability to pay.  Defendant argues that, as a practical matter, in prison one has no meaningful earning capacity, and there is no evidence he had substantial assets.  Thus, under the circumstances, the imposition of those fines and fees violated his right to due process and equal protection.

The People respond that defendant has forfeited the claim by failing to raise any due process argument with the trial court, let alone express concern about ability to pay.

We decline to find forfeiture because the trial court imposed only the minimum restitution fines along with mandatory operation and conviction assessments, and therefore at the time of sentencing, which was pre-*Dueñas*, defendant had no cause to object.  (See *People v. Jones* (2019) 36 Cal.App.5th 1028, 1034 (*Jones*) ["[the defendant] could not have been expected to anticipate *Dueñas*, even though *Dueñas* applied

23

principles first articulated in other contexts long ago"]; cf. *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154 [Pre- *Dueñas*, the defendant had an obligation to object on ability to pay grounds where the trial court imposed the maximum restitution fine].)

In considering the merits, we note that *Dueñas* is currently being debated, and our Supreme Court is now poised to resolve this question, having granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844, which followed *Dueñas* in part. (*Kopp*, at pp. 94-97.) But we need not take a position on that debate here, because assuming *Dueñas* was correctly decided, any error in failing to determine defendant's ability to pay before imposing the minimum fines and fees was harmless.

Courts applying *Dueñas* have held the failure to conduct an ability to pay hearing harmless where the imposed prison term affords sufficient time to pay the fines through prison earnings. (See *Jones*, *supra*, 36 Cal.App.5th at p. 1035 ["Given that the restitution fine is $300 and the assessments are $70, Jones will have sufficient time to earn these amounts during his sentence, even assuming Jones earns nothing more than the minimum"]; *People v. Johnson* (2019) 35 Cal.App.5th 134, 139 ["The idea that he cannot afford to pay $370 while serving an eight-year prison sentence is unsustainable"].) And here, defendant has challenged a total of $370 in fines and fees. Nothing in the record indicates his now 16-year-to-life term will not afford him ample opportunity to pay those assessments.

Accordingly, any error in failing to determine defendant's ability to pay was harmless.

*****

24

## DISPOSITION

The judgment is modified to strike the one-year prior prison term enhancement imposed under Penal Code section 667.5, subdivision (b).  The clerk of the trial court is directed to amend the abstract of judgment accordingly and forward a copy thereof to the Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.

                                    /s/
                              MURRAY, J.

We concur:

      /s/
ROBIE, Acting P. J.

      /s/
HOCH, J.

25